633 F.2d 114
 80-2 USTC P 9755
 CORN BELT TELEPHONE COMPANY, Mutual Telephone Company,
Schaller Telephone Company, Northwest Iowa
Telephone Co., Inc., Arthur E. and Ruth
E. Long, Charles A. and Mary
L. Long, Appellees,
v.
UNITED STATES of America, Appellant.
 No. 80-1025.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Sept. 9, 1980.
Decided Oct. 27, 1980.
 
 M. Carr Ferguson, Asst. Atty. Gen., Gilbert E. Andrews, Ann Belanger Durney, Anthony Ilardi, Jr., argued, Attys., Tax Div., Dept. of Justice, Washington, D. C., for appellant.
 Robert D. Mishne, Marvin J. Klass, A. J. Stoik, Sioux City, Iowa, for appellees.
 Before BRIGHT, ROSS and STEPHENSON, Circuit Judges.
 BRIGHT, Circuit Judge.
 
 
 1
 For the tax years involved in this suit, section 46 of the Internal Revenue Code generally provided for an investment tax credit equal to seven percent of a taxpayer's qualified investment in certain depreciable property. I.R.C. § 46(a). For "public utility property," however, section 46(c)(3)(A) limited the writeoff to four percent of the taxpayer's investment. Id. § 46(c)(3)(A).
 
 
 2
 In this case six independent telephone companies doing business in Iowa (taxpayers) claimed the seven percent credit on property acquired for use in their businesses. The Internal Revenue Service determined that these acquisitions constituted "public utility property," however, and allowed only the four percent credit. On the basis of this determination, the Service assessed deficiencies against taxpayers, all of whom paid the assessment under protest and subsequently filed claims for refunds. After their refund claims had been denied, taxpayers filed the consolidated actions now before us alleging that the increased assessment of taxes, penalties, and interest was erroneous and illegal.
 
 
 3
 The district court found that taxpayers had not acquired "public utility property" within the meaning of section 46(c)(3)(B) and, therefore, were entitled to claim a seven percent investment tax credit on their investments rather than the four percent credit allowed by the Internal Revenue Service. The Government appeals the district court's construction of section 46(c)(3) (B). We reverse.
 
 
 4
 I. Statutory Background.
 
 
 5
 The Kennedy administration originally proposed a tax investment credit program to Congress in 1961 as a means of stimulating economic growth, increasing the profitability of productive investment by reducing the net cost of acquiring new equipment, spurring productivity and output, and improving the competitiveness of American exports in world markets. See House Hearings Before the Comm. on Ways and Means on the President's 1961 Tax Recommendations, 87th Cong., 1st Sess. (1961). As proposed, the Kennedy plan would not have granted an investment tax credit to regulated public utilities on the ground that consumer demand rather than government tax incentives largely determine the capital investment decisions of public utilities.
 
 
 6
 The Congress, however, decided to grant a reduced credit of three percent (subsequently amended to four percent) for investments in public utility property rather than completely disallow the seven percent credit it otherwise made available for qualified investments under the Revenue Act of 1962, Pub.L.No. 87-834, 76 Stat. 960 (1962). See H.Rep.No. 1447, 87th Cong., 2d Sess. 8 (1962). As originally enacted, section 46(c)(3)(B) defined "public utility property" to include acquisitions by telephone companies and similar businesses only if the investor's rates were regulated by a state or state agency.[1]
 
 
 7
 After its adoption in 1962, the investment tax credit lived an intermittent existence. Congress suspended its effect in 1966 and 1967 (Pub.L.No. 89-800, 80 Stat. 1508 (1966), as amended by Pub.L.No. 90-26, 81 Stat. 57 (1967)), terminated the credit in 1969 (Tax Reform Act of 1969, Pub.L.No. 91-172, 83 Stat. 487, § 703(a) (1969)), but reinstated an investment tax credit program in 1971 (Revenue Act of 1971, Pub.L.No. 92-178, 85 Stat. 497, § 101 (1971)).
 
 
 8
 In its 1971 hearings on restoring an investment credit to the tax laws, Congress heard extensive testimony on the changed nature of the telephone business since the credit's original enactment in 1962. In particular, industry representatives pointed to the increased competition of unregulated businesses in providing certain communication services that in the past had been provided only by regulated telephone companies. They urged that the telephone industry qualify for the seven percent credit rather than a smaller credit or, alternatively, that the four percent credit apply equally to all communications equipment so as to eliminate the competitive disadvantage suffered by regulated companies under the original statute. See Senate Hearings Before the Comm. on Finance on the Revenue Act of 1971, 92d Cong., 1st Sess. 156-610 (1971); S.Rep.No. 92-437, 92d Cong., 1st Sess. 35-36 (1971), reprinted in (1971) U.S.Code Cong. & Ad.News 1825, 1918, 1942-44.
 
 
 9
 In response to this and other testimony, Congress made three significant changes in section 46(c)(3). First, it increased the investment credit allowable on public utility property from three to four percent. See Revenue Act of 1971, Pub.L.No. 92-178, 85 Stat. 497, § 105(a) (1971). Second, it combined clauses (iii) and (iv) into a new clause (iii) and added the phrase "or other communications services (other than international telegraph service)." Id. § 105(b)(1). Finally, Congress broadened the definition of "public utility property" to include not only the acquisitions of state rate-regulated investors, but also "communication property of the type used by persons engaged in providing telephone or microwave communication services." Id. § 105(b)(2). Section 46(c)(3) in 1971 thus provided:
 
 
 10
 (3) Public Utility Property.-
 
 
 11
 (A) In the case of section 38 property which is public utility property, the amount of the qualified investment shall be 4/7 of the amount determined under paragraph (1).
 
 
 12
 (B) For purposes of subparagraph (A), the term "public utility property" means property used predominantly in the trade or business of the furnishing or sale of-
 
 
 13
 (i) electrical energy, water, or sewage disposal services,
 
 
 14
 (ii) gas through a local distribution system, or
 
 
 15
 (iii) telephone service, telegraph service by means of domestic telegraph operations (as defined in section 222(a)(5) of the Communications Act of 1934, as amended; 47 U.S.C., Sec. 222(a)(5)), or other communication services (other than international telegraph service ),
 
 
 16
 if the rates for such furnishing or sale, as the case may be, have been established or approved by a State or political subdivision thereof, by an agency or instrumentality of the United States, or by a public service or public utility commission or other similar body of any State or political subdivision thereof. Such term also means communication property of the type used by persons engaged in providing telephone or microwave communication services to which clause (iii) applies, if such property is used predominantly for communication purposes. (I.R.C. § 46(c)(3) (changes from the original in emphasis).)
 
 
 17
 II. Discussion.
 
 
 18
 The issue presented in this appeal arises out of the manner in which the State of Iowa regulates public utilities. Although Iowa regulates all telephone companies operating within the state, it exempts from rate regulation those telephone companies serving less than 2,000 subscribers. See Iowa Code Ann. § 476.1 (West Supp. 1980-1981) (formerly § 490A.1). Taxpayers in this case qualify for this exemption and, further, operate under exclusive franchises that limit their operations to a specific area within the state. Thus, neither taxpayers nor their property actually compete with any regulated telephone company in establishing rates or in providing telephone or other communication services to localized areas of Iowa.
 
 
 19
 Taxpayers argue, therefore, and the district court agreed, that the statutory purpose for expanding the definition of public utility property to include telephone-type property does not require application of the four-percent limitation to their investments. Congress, by stressing the changed nature of competition in the telephone industry as the reason for adding the second sentence of section 46(c)(3)(B), made clear that it intended the four-percent limitation to apply to only those businesses which compete with regulated telephone companies. Because taxpayers do not compete with rate-regulated telephone companies, the Internal Revenue Service erroneously applied the four-percent limitation to taxpayers' property even if that property is "of the type used by persons engaged in providing telephone or microwave communication services."
 
 
 20
 The Government, on the other hand, contends that the plain meaning of this language requires application of the four-percent limitation to taxpayers' investments. Section 46(c)(3)(B) defines "public utility property" in two sentences. Only the first sentence defines "public utility property" by reference to the user of the property or the user's status as a rate-regulated business; the second refers to a type of property regardless of whether the user competes with regulated telephone companies or other communication services. Thus, the statutory language admits of no other reading than the acquisition of telephone-type property, whether used by regulated or unregulated companies, constitutes "public utility property" for which investors may claim only a four percent tax credit.
 
 
 21
 Both parties cite generously from the legislative history of this section in support of their views, but the only fair conclusion to be drawn from the legislative material is that Congress did not specifically consider whether the four-percent rate should apply to these particular taxpayers. Nothing in the legislative history demonstrates that Congress, in adopting the second sentence of section 46(c)(3)(B), realized the existence of, or desired to treat differently, rate-unregulated telephone companies such as taxpayers, which because they operate as exclusive franchises, do not compete with regulated telephone companies in providing communication services. Indeed, such companies apparently exist only because of the manner in which the State of Iowa regulates public utilities. Thus, the legislative history cannot be read affirmatively to exclude application of the four-percent limitation to taxpayers.
 
 
 22
 Taxpayers nevertheless conclude that portions of the legislative history indicating congressional concern over equalizing the tax treatment of regulated telephone companies and private or unregulated competitors demonstrates that the general rule of a seven-percent writeoff should apply here. In particular, taxpayers note the Senate Finance Committee's explanation for amending section 46(c)(3).
 
 
 23
 Reasons for provisions.-* * * (R)egulated companies are encountering increased competition from other regulated companies and, in the case of many of their products, from unregulated companies as well. In view of these factors, the committee agreed with the House that it was appropriate to lessen the difference between the credit allowable for public utilities and for taxpayers generally. In order to equalize the treatment of regulated companies in substantial competition with each other, changes have been made in the categories of regulated property to which the 4-percent credit-as distinct from the 7-percent credit-is to be available. Additionally, a committee amendment limits to 4 percent the credit provided for certain property used in competition with public utility property, even though such property is used by unregulated taxpayers. (S.Rep.No. 92-437, 92d Cong., 1st Sess., reprinted in (1971) U.S.Cong. & Ad.News 1918, 1942-43.)
 
 
 24
 Investment credit rate.-* * *
 
 
 25
 The House bill changed prior law by limiting international telegraph companies to the partial credit. The committee has amended the bill to restore the full credit to such companies, since it concluded they are not properly comparable to domestic telegraph companies and other communication companies. They are in active competition with one another, rather than having an exclusive franchise as in the case of the ordinary utility, and they compete with foreign international telegraph companies, substantially all of which are owned or controlled by foreign governments, rather than with the domestic telegraph or telephone industry.
 
 
 26
 The committee was impressed by the trend among unregulated businesses to install their own communications equipment rather than equipment made available by the regulated companies. The committee concluded that, in order to avoid having the renewed investment credit create an improper discrimination in such competition, it was necessary to equalize the rate of investment credit available to the competitors. As a result, the committee decided to limit to 4 percent the credit for communication property of the type used by unregulated telephone and microwave communication companies, if the property is used predominantly for communication purposes. (Id. at 44 (footnote omitted).)
 
 
 27
 A reading of the statute, however, reveals that Congress legislated broadly without regard to the existence of actual competition between providers of communications services. Although Congress may have endeavored to equalize the tax treatment of competitors, it chose to do so in terms of the type of property used predominantly for communication purposes rather than in terms of the users of such property. By restricting to four percent the investment tax credit available for telephone-type property used predominantly for communications purposes, all such property became "competing" property for tax purposes whether or not the entities providing such services compete with one another in fact.
 
 
 28
 In essence, the fact of competition is immaterial under the plain language of section 46(c)(3)(B). The section attributes to communications property the status of "public utility property" regardless of the user's status as a competitor of regulated telephone companies. Accordingly, we hold that the district court erred in reading the language and legislative history of section 46(c)(3)(B) to permit application of the four-percent tax credit limitation only where the taxpayer directly competes with providers of telephone or other communications services.
 
 
 29
 Reversed and remanded for further proceedings consistent with this opinion.
 
 
 
 [1]
 Section 46(c)(3), as originally enacted, read:
 (3) Public Utility Property.-
 (A) In the case of section 38 property which is public utility property, the amount of the qualified investment shall be 3/7 of the amount determined under paragraph (1).
 (B) For purposes of subparagraph (A), the term "public utility property" means property used predominantly in the trade or business of the furnishing or sale of-
 (i) electrical energy, water, or sewage disposal services,
 (ii) gas through a local distribution system,
 (iii) telephone service, or
 (iv) telegraph service by means of domestic telegraph operations (as defined in section 222(a)(5) of the Communications Act of 1934, as amended; 47 U.S.C., sec. 222(a)(5)),
 if the rates for such furnishing or sale, as the case may be, have been established or approved by a State or political subdivision thereof, by an agency or instrumentality of the United States, or by a public service or public utility commission or other similar body of any State or political subdivision thereof.